November 21, 2019

**Supreme Court**

No. 2018-20-C.A.
(K1/14-160A)

|  |  |
|---|---|
| State | : |
| v. | : |
| Stephen Mulcahey. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at (401) 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Stephen Mulcahey. | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.** This case came before the Supreme Court for oral argument on October 3, 2019, on appeal by the defendant, Stephen Mulcahey, from a judgment of conviction, following a jury trial, for first-degree sexual assault in violation of G.L. 1956 § 11-37-2. Before this Court, the defendant argues that the Superior Court erred in admitting evidence of text messages allegedly sent by the defendant to the complainant because, he argues, the text messages were not properly authenticated under Rule 901 of the Rhode Island Rules of Evidence. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## Facts and Travel

In October 2013, Victoria,[1] the complainant, a seventeen-year-old high school senior, was residing with her maternal aunt, Cristee McCormick (McCormick), in an apartment in Coventry, Rhode Island. The defendant, who was McCormick's boyfriend, also lived at the apartment for an unspecified period after McCormick obtained custody of Victoria. At trial, the complainant described defendant as kind of "like a father figure," who would help her with her

---

[1] We refer to the complainant in this case by a pseudonym.

schoolwork and provide transportation when needed. However, Victoria testified, defendant sometimes made her feel uncomfortable: "Well, if he would give me a ride somewhere and when I would be like waiting in the car or something and we would go to a restaurant or something, he would like sit next to me and put his hand on my leg or something."

On October 27, 2013, after spending the evening at a movie theater with her grandfather, Victoria returned to McCormick's apartment to eat Chinese food and watch a scary movie with McCormick, defendant, and defendant's brother. Victoria sat on the couch and covered herself with a comforter blanket. The defendant sat between Victoria and McCormick, and defendant's brother was seated on a chair.

According to Victoria, just before the movie was about to begin, defendant pulled the blanket over her head. Victoria tried to move the comforter out of the way, "but then things happened." The defendant started to rub Victoria's back, which made her feel "uncomfortable and a little bit nervous[.]" Victoria testified that she "thought that [defendant] thought that [she] was [McCormick] so [she] tried to move around so that he would know that it was [her]." Then defendant "started to rub [her] butt[,]" and, again, she tried to move around more to indicate to defendant that she was not McCormick. The defendant, however, proceeded to rub Victoria's belly under her clothes, and he touched her vagina.

At that point, when McCormick walked to the bathroom and then to the kitchen to smoke a cigarette, defendant whispered in Victoria's ear that he wanted to "kiss [her] down there[,]" and "taste [her] down there and lick [her]." The defendant then put his hand inside her vagina. When she tried to pull defendant's hand out by grabbing his arm, he "put it in harder[,]" which "really hurt and it made [Victoria] very afraid." Victoria estimated that the assault lasted for about thirty minutes. When the movie ended, Victoria went next door to her grandmother's apartment to shower, and she noticed that she was bleeding from her vagina.

Within hours of the assault, at 12:30 a.m., Victoria received the following four text messages from defendant:

"Hope I didn't do anything to upset you good night sleep well"
"Did I upset you"
"Good night sleep well you are a beautiful person"
"Can't stop thinking about you"

At 7:37 a.m., Victoria received the following text message from defendant: "Good morning hope you have a great day[.]" And, at 11:19 a.m., Victoria received the following text message from defendant: "Are you still sleeping[?]" After the last text message, Victoria took a screenshot of her phone depicting the six text messages from defendant, but she did not respond to any of them.

The next day, while driving to a therapy appointment, Victoria told McCormick about the assault. She also told her therapist, Eric McKnight, who immediately reported the assault to the Coventry police. Later that day, Victoria and McCormick went to the Coventry police station to report the assault. A Coventry police officer advised Victoria to go to the hospital. But, at the hospital, she testified, she was afraid to undergo an examination and "felt very scared to do that" and was "freaking out." According to Victoria, the doctors "said that they weren't going to do anything because they didn't want to make [her] more scared."

On October 31, 2013, Victoria met with Detective Jason Burlingame (Det. Burlingame), the Coventry police officer who had been assigned to the investigation. Victoria told Det. Burlingame about the text messages she received from defendant and showed him the screenshot of her phone. Detective Burlingame testified that he interviewed defendant and that, when he showed defendant the screenshot of the text messages, defendant stated that he had sent them.

On March 4, 2014, defendant was charged by criminal indictment with one count of first-degree sexual assault, in violation of § 11-37-2. The defendant filed a pretrial motion *in limine*

to suppress evidence of the text messages, arguing that the state would not be able to meet its burden to properly authenticate the evidence in accordance with Rule 901 through the testimony of Victoria alone. The state, however, argued that Victoria's testimony about her history of texting defendant was sufficient to properly authenticate the text message evidence.

After hearing arguments from both parties, the trial justice, citing to federal caselaw, laid out the following six factors for the court to consider when determining whether evidence of text messages has been properly authenticated: (1) "Whether someone with personal knowledge connects the person to the specific phone and phone number"; (2) "The witness must show through direct or circumstantial evidence that the phone has the capacity to send and receive text messages"; (3) "The witness needs to explain how the caller I.D. on the phone where the texts [were] received links [the] text messages by a name or number to a particular person"; (4) "[D]irect or circumstantial evidence that [the person has] received phone calls or text messages from that number * * * in the past"; (5) "The witness must testify that they received and read the text messages"; and (6) Circumstantial evidence establishing authorship.[2] The trial justice then reserved ruling on the motion, and the case proceeded to trial.

At trial, Victoria testified that, about a year before the assault, defendant provided her with his cell phone number and she saved the number in her contacts under the name "Steph."[3] Victoria testified that her phone was capable of sending and receiving text messages, and that she routinely exchanged text messages with defendant for a variety of reasons, such as to arrange rides to and from school and therapy appointments. Simply put, Victoria would text defendant, and he would arrive to transport her to and from her appointments. Victoria further testified that,

---

[2] We note that the factors relied upon by the trial justice are relevant to this inquiry, but not controlling.

[3] Victoria referred to defendant as "Steph" because "that's what everyone called him."

within hours of the assault, she received the text messages from defendant, which she read but to which she did not respond.

At that point, the trial justice addressed the authentication issue at the sidebar. After hearing arguments from the parties, the trial justice found that "based on the foundational questions," the state had met its burden, and she therefore denied defendant's motion *in limine*. The prosecutor then showed the screenshot to Victoria and proceeded to lay additional foundation:

> "Q.    * * *. Are you familiar with that photograph?
> "A.    Yes. * * *
> "Q.    What is that a photograph of?
> "A.    A text that Ste[p]h sent me that night and in the morning. * * *
> "Q.    When was that photograph taken?
> "A.    After I got the last text message. * * *
> "Q.    Did you take that photograph or did someone else take the photograph?
> "A.    I did. I did a screen shot of it. * * *
> "* * *
> "Q.    So that photograph is what you saw on your phone on or about October 27, 2013?
> "A.    Yes.
> "Q.    Does that photograph accurately depict the image on your phone as you observed it on or about October 27, 2013?
> "A.    Yes."

The prosecutor offered the evidence as a full exhibit, and the trial justice—over defendant's objection—admitted the screenshot of the text messages.

On March 12, 2015, the jury returned a verdict of guilty. The defendant's motion for a new trial was heard and denied on April 29, 2015. The defendant was sentenced to thirty-five years at the Adult Correctional Institutions, with twenty years to serve and the balance suspended, with probation. The defendant filed a notice of appeal on June 1, 2015.[4]

---

[4] The Superior Court did not enter final judgment until June 15, 2015. The defendant's notice of appeal, although premature, is sufficient because judgment was entered thereafter. *See* Article I,

**Standard of Review**

"It is well established that decisions concerning the admissibility of evidence are within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent." *State v. Stokes*, 200 A.3d 144, 150 (R.I. 2019) (quoting *State v. Alves*, 183 A.3d 539, 542 (R.I. 2018)). "The trial justice will not have abused his or her discretion as long as some grounds supporting his or her decision appear in the record." *Id.* (quoting *State v. Adams*, 161 A.3d 1182, 1194 (R.I. 2017)).

**Analysis**

The defendant argues that the trial justice erred when he admitted evidence of the text messages based on the state's failure to authenticate the messages under Rule 901. Specifically, defendant argues that, to authenticate evidence of text messages, the proponent must establish authorship through either direct or circumstantial evidence. According to defendant, to establish authorship through circumstantial evidence, the proponent must produce evidence of distinctive characteristics of the text messages. The defendant argues that, because the state did not produce either direct evidence or evidence of distinctive characteristics of the text messages, it did not establish that the text messages were authored by defendant and, therefore, did not properly authenticate the evidence in accordance with Rule 901.

Reliability is the linchpin of the law of evidence. The authentication requirement of Rule 901 is a threshold requirement to establishing the reliability of a matter of evidence. *O'Connor v. Newport Hospital*, 111 A.3d 317, 322 (R.I. 2015). Rule 901 provides, in part:

> "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to

Rule 4(b) of the Supreme Court Rules of Appellate Procedure ("A notice of appeal filed after the announcement of a decision, sentence or order but before entry of the judgment or order shall be treated as filed after such entry and on the day thereof."); *see also Toegemann v. City of Providence*, 21 A.3d 384, 386 n.3 (R.I. 2011).

support a finding that the matter in question is what its proponent claims." R.I. R. Evid. 901(a).

"The burden of proof for authentication, however, is slight." *Adams*, 161 A.3d at 1199 (brackets omitted) (quoting *O'Connor*, 111 A.3d at 323). Indeed, to authenticate evidence under Rule 901, the proponent of such evidence does not face a high hurdle.

"In making Rule 901 determinations, trial justices must decide whether there is enough support in the record to conclude that it is 'reasonably probable' that the evidence is what its offeror proclaims it to be." *Adams*, 161 A.3d at 1199 (brackets and alteration omitted) (quoting *O'Connor*, 111 A.3d at 323). "If so, then the evidence's [per]suasive force is for the jury to decide." *Id.* (quoting *O'Connor*, 111 A.3d at 323). "Thus, a trial justice need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the jury ultimately might do so." *Id.* (emphasis omitted) (quoting *O'Connor*, 111 A.3d at 323).

This Court has not yet spoken on the issue of authenticating text message evidence. But we have addressed the use of text message evidence in the context of a probation violation hearing and acknowledged that "[s]trict application of the rules of evidence is not required at a probation violation hearing." *State v. McLaughlin*, 935 A.2d 938, 942 (R.I. 2007) (quoting *State v. Rioux*, 708 A.2d 895, 898 (R.I. 1998)). In *McLaughlin*, we held that a photograph of the complainant's phone, which depicted text messages purportedly sent by the defendant, was properly authenticated by the testimony of a police officer who took the photograph. *Id.* We reasoned that the officer's testimony that he examined the phone, and that he determined that the text messages were unaltered and had been sent from the same number that officers used to contact the defendant, was sufficient for authentication. *Id.*

In *O'Connor*, this Court considered, as a matter of first impression, whether a printout of an e-mail was properly authenticated under Rule 901. *O'Connor*, 111 A.3d at 323. We stated

that an e-mail may be authenticated by direct evidence, "through the testimony of a witness with personal knowledge that the proffered exhibit is what it is claimed to be, such as the author or recipient of the email[,]" or by "circumstantial evidence, including 'appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.'" *Id.* at 325 (brackets omitted) (quoting R.I. R. Evid. 904(b)(4)). Accordingly, we held that the testimony of a witness who was neither the sender nor the recipient of the e-mail, but who merely recited the identity of the purported sender and summarized the contents of the message, was insufficient for authentication. *Id.* There is, however, a fundamental difference between text messages, which generally are sent to one person known to the sender, and an e-mail.

When, as here, the Rhode Island rule mirrors the federal rule, we look to decisions of federal courts for guidance. *E.g.*, *Chhun v. Mortgage Electronic Registration Systems, Inc.*, 84 A.3d 419, 422 (R.I. 2014); *Hall v. Kuzenka*, 843 A.2d 474, 476 (R.I. 2004); *Heal v. Heal*, 762 A.2d 463, 466-67 (R.I. 2000). In *United States v. Davis*, 918 F.3d 397 (4th Cir. 2019), for example, the Fourth Circuit Court of Appeals addressed the use of text messages and held that authentication of text message evidence under Rule 901 of the Federal Rules of Evidence requires "only a prima facie showing that the 'true author' is who the proponent claims it to be." *Davis*, 918 F.3d at 402; *see also United States v. Lewisbey*, 843 F.3d 653, 658 (7th Cir. 2016) (holding that, for purposes of authentication under Rule 901 of the Federal Rules of Evidence, the proponent need only produce enough evidence to support a finding that the person sent and received the text messages); *United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) (holding that conclusive proof of authorship is not required for authentication under Rule 901 of the Federal Rules of Evidence). "And the prima facie showing 'may be accomplished largely by

offering circumstantial evidence that the documents in question are what they purport to be.'" *Davis*, 918 F.3d at 402 (quoting *United States v. Vidacak*, 553 F.3d 344, 350 (4th Cir. 2009)).

The *Davis* court determined that the proponent produced enough circumstantial evidence to properly authenticate evidence of text messages exchanged between the accused, who was charged with conspiracy, and a confidential informant. *Davis*, 918 F.3d at 402. First, the court reasoned, the context and purpose of the text messages—to arrange the location of the controlled buy and the price for the contraband—supported the conclusion that the defendant was the author of the text messages because the defendant was witnessed arriving at the agreed-upon location and engaging in the controlled buy. *Id.* Second, before the controlled buy, the defendant spoke on the phone with the informant, and the defendant testified at trial that the telephone call was made to "the same number that the informant was texting" to set up the controlled buy. *Id.* at 403 (brackets omitted). Finally, there was no evidence that the contact information linked to the number from which the text messages were sent referred to any person other than the defendant. *Id.*; *see United States v. Fults*, 639 F. App'x 366, 373 (6th Cir. 2016) (holding that the content of the text messages and testimony about previous communications with the author using the same number were enough to properly authenticate the evidence).

Here, unlike the proffered e-mail in *O'Connor*, the state produced evidence beyond a mere recitation of the author's identity and summary of the contents of the proffered evidence. As in *Davis*, the state presented testimony about previous communications between Victoria and defendant and produced evidence as to the context and timing of the text messages to establish authorship. Both the incriminating context and timing of the text messages are not only probative of guilt, but highly relevant for authentication. Victoria also testified that defendant personally provided her with his cell phone number about a year before the assault and that she saved it in her contacts under "Steph." Victoria exchanged text messages with the number

- 9 -

associated with "Steph" on multiple occasions prior to the date of the assault. For example, Victoria would text "Steph" to arrange transportation to and from school and Victoria's therapy appointments. And, when Victoria texted "Steph" to pick her up, defendant picked her up. Additionally, the text messages depicted in the screenshot were not only apologetic in nature but were also sent to Victoria within hours of the assault.

We conclude that the state produced sufficient circumstantial evidence to establish that the defendant authored the text messages. We therefore hold that the trial justice did not abuse his discretion in admitting the text messages, because the evidence was properly authenticated under Rule 901. Any doubt as to whether the defendant authored the text messages was for the jury to resolve.

## Conclusion

For these reasons, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Stephen Mulcahey. |
| **Case Number** | No. 2018-20-C.A. (K1/14-160A) |
| **Date Opinion Filed** | November 21, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Kent County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Brian P. Stern |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General |
| | For Defendant:<br><br>Brett V. Beaubien, Esq. |

SU-CMS-02A (revised June 2016)